IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

**CORPORATE AMERICA**
**CREDIT UNION,**
          **Plaintiff.**

v.                                                     **CIVIL ACTION NO.**
                                                       **2:09-cv-2126-IPJ**

**JOSEPH HERBST et al.,**
          **Defendants.**

### MEMORANDUM OPINION

Pending before the court is defendant RubinBrown's Motion to Dismiss for Lack of Personal Jurisdiction (doc. 21) and brief in support (doc. 22), plaintiff's response (doc. 32), and defendant's reply (doc. 39). Also pending before the court is defendant RubinBrown's Motion to Dismiss and/or Stay Lawsuit Pending Arbitration (doc. 23) and brief in support, (doc. 24), plaintiff's response (doc. 33), and defendant's reply (doc. 40).

Plaintiff Corporate America Credit Union ("Corporate America") is a corporate credit union serving retail credit unions in Alabama, where it is chartered. Compl., ¶ 18. Corporate America is a member of U.S. Central Federal Credit Union ("U.S. Central"), a wholesale credit union that acts as "corporate credit union to corporate credit unions" and is owned by its 26 corporate credit

1

union members. Compl., ¶ 27; Valuation of New Equity Instrument ("Valuation"), at 5 (doc. 34-2). U.S. Central provides liquidity, risk management, and backroom services to its members. Compl., ¶ 27.

During the collapse of the U.S. mortgage markets, U.S. Central reported a $760 million writedown of subprime-related investments, and as a result, Standard & Poor's downgraded U.S. Central's credit and debt ratings. Compl., ¶ 42. U.S Central sought to improve its capital position and prevent any further downgrades in its credit ratings. Comp., ¶¶ 47, 49. To do this, U.S. Central solicited its 26 members' exchange of $450 million of "withdrawable, debt-like Members' Capital Shares ('MCS') for newly issued equity-like Paid-In Capital ('PIC II') shares." Compl., ¶¶ 47, 49.

On November 4, 2008, U.S. Central discussed its plan to solicit the exchange of MCS for PIC II securities with Corporate America and stated that it had obtained a report, dated October 31, 2008, from RubinBrown, a public accounting firm, valuing the PIC II securities. Compl., ¶ 55. The first page of the report states, "The accompanying valuation and this report letter were prepared for internal purposes for use by U.S. Central, its 26 corporate members, and their respective auditors, and should not be used for any other purpose(s)." Valuation, at 1 (doc. 34-2). It includes an executive summary that notes that U.S. Central is a

wholesale credit union owned by its members and was offering to exchange its members' MCS for PIC II securities. It describes the PIC II securities and notes that the securities will be available only to corporate credit union members of U.S. Central. Valuation, at 5 (doc. 34-2). It again notes in its "Statement of Contingent and Limiting Conditions" that the valuation cannot be used "by any person other than the client to whom it is addressed without our written consent, and, in any event, only with proper written qualifications and only in its entirety." Valuation, at 31 (doc. 34-2). The report represents that the PIC II securities were worth at least $450 million, while plaintiff alleges that the securities were completely worthless upon issue. Comp., ¶ 58.

In counts 3, 5, and 11 of the complaint, plaintiff alleges RubinBrown provided material aid to other named defendants in violation of the Securities Act of Alabama and the Kansas Uniform Securities Act, and that RubinBrown committed professional malpractice in the preparation of the report. RubinBrown has filed a motion to dismiss for lack of personal jurisdiction and a motion to dismiss and/or stay the lawsuit pending arbitration.

## Personal Jurisdiction

"A federal court sitting in diversity may exercise jurisdiction over a nonresident defendant to the same extent as a court of that state." *Ruiz de Molina*

*v. Merritt & Furman Ins.*, 207 F.3d 1351, 1355 (11th Cir. 2000) (citations omitted). Because Alabama's long-arm statute permits the exercise of jurisdiction over nonresident defendants to the maximum extent that due process allows, the two analyses collapse into one. ALA. R. CIV. P. 4.2(b); *Ex parte Duck Boo Int'l Co.*, 985 So. 2d 900, 907-08 (Ala. 2007) (citations omitted). Due process requires a nonresident defendant to have "minimum contacts" with the state such that "the exercise of personal jurisdiction over the defendant would not offend 'traditional notions of fair play and substantial justice.'" *Molina.*, 207 F.3d at 1356 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Williams Elec. Co. v. Honeywell, Inc.*, 854 F.2d 389, 392 (11th Cir. 1998)).

1. Minimum Contacts

In order for the plaintiff to establish that the defendant has constitutionally minimum contacts, the defendant's contacts with the forum must satisfy three criteria.

> First, the contacts must be related to the plaintiff's cause of action or have given rise to it. [*Burger King v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2181]. Second, the contacts must involve "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws." [*Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240]. Third, the defendant's contacts with the forum must be "such that [the defendant] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*,

444 U.S. 286, 297, 100 S.Ct. 559, 567 (1980).

*Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993) (some citations omitted).

The contacts sufficient to allow this court to exercise jurisdiction over defendant in this case arise from the defendant's report and valuation of the PIC II securities offered by U.S. Central.  Counts three and five of the complaint allege that RubinBrown provided material aid to other named defendants' violation of the Securities Act of Alabama and the Kansas Uniform Securities Act by creating a false and misleading valuation report.  Count eleven alleges professional malpractice for RubinBrown's failure to use reasonable care and diligence in preparing the valuation report.  Because RubinBrown's creation of the report relates directly to Corporate America's causes of action for providing such material aid and performing professional malpractice, the first factor is satisfied.

Moreover, RubinBrown stated that U.S. Central intended to strengthen its capital position by reclassifying $450 million of capital from MCS to PIC II securities.  These securities would be offered only to the 26 corporate credit union members, who were also the collective owners of U.S. Central.  Valuation, at 5 (doc. 34-2).  In a letter accompanying the valuation report, RubinBrown states that the report was "prepared for internal purposes for use by U.S. Central, its 26

corporate members, and their respective auditors, and should not be used for any other purpose(s)," Valuation, at 1 (doc. 34-2), a point that is reiterated in the report's Statement of Contingent and Limiting Conditions. Valuation, at 31 (doc. 34-2).

Thus, it is quite clear that RubinBrown created the report intending the plaintiff, an Alabama resident, to read, use, and rely upon it in making a $450 million investment decision. Such an act purposefully avails RubinBrown of the privilege of conducting activities within Alabama, invoking the benefits and protections of its laws, and gave rise to a reasonable expectation of the possibility of ensuing litigation in Alabama should the plaintiff find that the report was prepared without due care.

2. Fair Play and Substantial Justice

Because the court has determined that RubinBrown has established sufficient minimum contacts with Alabama, the court must next consider whether the exercise of personal jurisdiction over it would conform with traditional notions of fair play and substantial justice. *Molina*, 207 F.3d at 1356 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "Relevant factors include 'the burden on the defendant, the interests of the forum . . . , and the plaintiff's interest in obtaining relief.'" *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 631 (11th

Cir. 1996) (citing *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1032 (1987)).

The burden on RubinBrown, based in St. Louis, Missouri, is relatively light. Although it must travel to Alabama to defend itself, it is not being forced to defend itself in another nation or in a foreign legal system. *See Asahi Metal Indus. Co.*, 480 U.S. at 114 (burden on the defendant is "severe" when it must travel from Japan to California to defend itself). Moreover, Alabama has an interest in protecting its financial institutions from harm inflicted by nonresident defendants. *See Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 259 (11th Cir. 1996); *Delong Equipment Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 850, 854 (11th Cir. 1988). Lastly, the plaintiff "has a great interest in the convenience of litigating in [its] home state." *Robinson*, 74 F.3d at 259.

Accordingly, this court finds that defendant RubinBrown had minimum contacts with Alabama such that the exercise of jurisdiction over it by this court does not offend traditional notions of fair play and substantial justice, and the defendant's motion to dismiss for lack of personal jurisdiction is **DENIED**.

## Arbitration

Michael Lewis, a partner at RubinBrown who signed the Agreement, acknowledged that "RubinBrown was retained by U.S. Central, and not by

[Corporate America]"; "RubinBrown did not solicit [Corporate America's] business"; and "RubinBrown and U.S. Central executed an Agreement. Affidavit of Michael T. Lewis In Support of Defendant RubinBrown LLP's Motion to Dismiss for Lack of Personal Jurisdiction, ¶¶ 5-7 (doc. 21-3) ("Lewis Affidavit"). He notes that "[a]t no time did RubinBrown ever communicate directly with [Corporate America]," and RubinBrown sent the valuation to U.S. Central, not to Corporate America. Lewis Affidavit, ¶¶ 10, 14 (doc. 21-3).

The "Agreement" between RubinBrown and U.S. Central was memorialized in two separate documents: a letter dated September 17, 2008, and an accompanying document entitled "Engagement Terms." Letter & Engagement Terms, Ex. A to Affidavit of Michael T. Lewis, Motion to Dismiss and/or Stay Lawsuit Pending Arbitration (doc. 23-1) ("Letter" or "Engagement Terms"). The letter, written by individuals at RubinBrown, was addressed to and signed by Kathryn E. Brick, U.S. Central's senior vice president and chief financial officer. Letter, at 1, 4 (doc. 23-1). The first page of the letter, in its entirety, states:

> We appreciate the opportunity to be of service to U.S. Central. This letter ("Letter") sets forth the services that RubinBrown LLP ("RubinBrown") will provide for you. In order to better understand each party's obligations, the terms "we", "us" and "our" refer to RubinBrown and the terms "you", "your", and "management" refer to U.S. Central. Your engagement of RubinBrown shall be governed by the terms of this Letter and the attached RubinBrown Engagement

Terms.

Letter, at 1 (doc. 23-1). The letter then incorporates the Engagement Terms by reference, Letter, at 3 (doc. 23-1), and is signed by only three people: two partners from RubinBrown and Kathryn Brick, who acknowledges that she "is authorized to approve the terms of this engagement on behalf of the Client." Letter, at 4 (doc 23-1).

The first sentence of the Engagement Terms states that the Engagement Terms and Letter were "entered into by and between RubinBrown LLP ("RubinBrown") and Client" and "set forth the terms and conditions of RubinBrown's engagement with Client." Engagement Terms, at 1 (doc. 23-1). The binding arbitration clause provides: "The parties agree that any and all disputes between them in any way concerning the services provided by RubinBrown pursuant to the Agreement . . . shall be committed to binding arbitration. . . ." Engagement Terms, at 5 (doc. 23-1).

When issues regarding interpretation and formation of arbitration agreements arise, courts must consult state law, but federal law "counsels that questions of arbitrability, when in doubt, should be resolved in favor of arbitration." *Employers Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001) (citing *Perry v. Thomas*, 482 U.S. 483, 492 n.9, 107

S.Ct. 2520, 2527 n.9 (1987) and *Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941 (1983)).  However, "[u]nder federal law, arbitration 'is a matter of consent, not coercion.'" *World Rentals and Sales, LLC v. Volvo Constr. Equipment Rents, Inc.*, 517 F.3d 1240, 1244 (11th Cir. 2008) (citing *Volt Info. Scis., Inc. v. Bd. of Trs. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S.C.t 1248 (1989)).  "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418 (1986) (quotations and citation omitted).

Although there are exceptions to the general rule that a non-signatory may be bound to an arbitration agreement, *see World Rentals and Sales, LLC*, 517 F.3d at 1244 (citing *Employers Ins. of Wausau*, 251 F.3d at 1322), "if the language of the arbitration provision is party specific and the description of the parties does not include the nonsignatory, this Court's inquiry is at an end, and we will not permit arbitration of claims against the nonsignatory." *Smith v. Mark Dodge, Inc.*, 934 So.2d 375, 381 (Ala. 2006) (citing *Jim Burke Auto., Inc. v. McGrue*, 826 So.2d 122, 131 (Ala. 2002)).  Indeed, "'[a]n arbitration agreement restricted to the immediate parties does not bind a non-party, notwithstanding words of incorporation or reference in a separate contract by which that non-party is

bound.'" *World Rentals and Sales, LLC*, 517 F.3d at 1246-47 (citing *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 47 (2nd Cir. 1993).

The Agreement at issue in this case is comprised of the four-page letter and the five-page Engagement Terms.  The letter is addressed to U.S. Central's chief financial officer and senior vice president, Ms. Kathryn Brick, who was authorized to bind only U.S. Central.  It begins, "We appreciate the opportunity to be of service to U.S. Central" and repeatedly refers to "you" and "your," terms explicitly defined by RubinBrown to mean U.S. Central.  While it also occasionally addresses the "client" or the "parties," U.S. Central and RubinBrown are the only entities discussed in the ten-page Agreement.  To argue that such party specific language extends to cover twenty-six additional credit unions is simply disingenuous.

This conclusion is bolstered when considering that only representatives from RubinBrown and U.S. Central signed the Agreement.  Ms. Brick's signature bound only the "Client," not "clients," and Mr. Lewis' testimony assures the court that RubinBrown neither solicited nor had any business with Corporate America. Mr. Lewis continues, stating that U.S. Central and *not* Corporate America, retained RubinBrown.  Under these circumstances, the court finds that the

language of the arbitration provision is party specific and does not include the nonsignatory. Accordingly, defendant's motion to dismiss and/or stay the lawsuit pending arbitration is **DENIED**.

## Conclusion

Based upon a consideration of the evidence submitted by the parties, the court finds that defendant RubinBrown's motion to dismiss for lack of personal jurisdiction is **DENIED**. The court also finds that defendant RubinBrown's motion to dismiss and/or stay the lawsuit pending arbitration is **DENIED**. The court shall so rule by separate order.

**DONE** and **ORDERED**, this the 25th day of February 2010.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE